IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH LYNN GAMBLE, | ) | Case No. 5:22-CV-01822 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Sarah Lynn Gamble, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Gamble challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in evaluating her subjective symptom complaints and residual functional capacity ("RFC"), specifically focusing her challenge upon the failure to address her need to elevate her legs and her inability to maintain attention and concentration. Also challenged is the lack of analysis of her obesity and its impact upon her functional abilities. Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Gamble's applications for DIB and SSI be affirmed.

I.      **Procedural History**

On July 27, 2020, Gamble applied for DIB and, on July 30, 2020, she applied for SSI.

(Tr. 210-217).[1]  Gamble alleged that she became disabled on July 24, 2020 due to: (i) pulmonary

atresia intact ventricular septem [*sic*], (ii) pulmonary valve stenosis, (iii) pulmonary valve

regurgitation, (iv) tricuspid regurgitation, (v) restrictive lung disease, (vi) depression,

(vii) anxiety, (viii) bipolar disorder, (ix) migraines, and (x) agoraphobia.  (Tr. 253, 258).  The

Social Security Administration denied her application initially and upon reconsideration.

(Tr. 75-82, 92-99).  Gamble requested an administrative hearing.  (Tr. 133-134).

On July 22, 2021, ALJ Susan Smoot heard Gamble's case telephonically and denied her

application in a September 22, 2021 decision.  (Tr. 20-30, 37-72).  In doing so, the ALJ

determined at Step Four of the sequential evaluation process that Gamble had the RFC to

perform work at the sedentary exertional level, with the following limitations:

> [Gamble] can occasionally lift and/or carry, including upward pulling, up to 20
> pounds and can frequently lift and/or carry, including upward pulling, up to 10
> pounds; she can stand and/or walk (with normal breaks) for a total of 2 hours in an
> 8-hour workday and can sit for about six hours in an 8-hour workday; she can
> occasionally climb ramps and stairs, and should never climbs ladders, ropes, or
> scaffolds; she should avoid exposure to dangerous, moving machinery and
> unprotected heights; and she can perform multistep tasks in [a] work setting that is
> free of fast-paced production requirements or strict production quotas.

(Tr. 24).

On August 15, 2022, the Appeals Council denied further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 6-8).  And, on October 11, 2022, Gamble

filed a complaint to obtain judicial review.  ECF Doc. 1.[2]

---

[1] The administrative record appears in ECF Doc. 6.
[2] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Gamble was born on November 26, 1985 and was 34 years old on the alleged onset date. (Tr. 272).  Gamble completed high school and had previously worked as an assistant manager at a fast food restaurant and as a group sales coordinator at a hotel, the latter of which the ALJ found Gamble could continue to perform.  (Tr. 28, 259).

### B.      Relevant Medical Evidence

Gamble focuses her challenge upon the ALJ's consideration of the evidence of her subjective pain complaints, obesity, leg issues, and mental health issues; thus, it is unnecessary to summarize the medical and other evidence related to her other impairments.

On June 17, 2020, Gamble was seen for her heart.  (Tr. 307).  It was noted that Gamble was born with "critical pulmonary stenosis vs pulmonary atresia with hypoplastic right ventricle" for which she had received a pulmonary valvotomy and shunt.  *Id.*  Gamble had undergone additional procedures in 1991, 2004, and 2006 for her heart.  *Id.*  In 2013, she had a valve replacement, which a later echocardiogram indicated was functioning well.  (Tr. 308).  At the June 17, 2020 visit, Gamble reported mild worsening in her exercise tolerance subsequent to her visit in March 2019.  *Id.*  Gamble indicated she had decreased energy overall and that she had missed dosages of her medication, noting that the medication only increased her edema.  *Id.*  She did not have any chest pain other than occasional brief sharp pain in the mid-sternal region.  *Id.* Gamble complained of migraine headaches 1-2 times per month, but otherwise her systems were normal.  *Id.*  Gamble's physical examination results were unremarkable.  (Tr. 309).  The following day, Gamble underwent an echocardiogram, and the impression was that Gamble had "[p]ulmonary atresia/critical PS, intact septum, HRV."  (Tr. 310-311).  It was noted that her

clinical examination was consistent with excellent valve function, her liver size was normal, and her edema was mild.  (Tr. 311).

On June 25, 2020, Gamble saw Robin Kollman, MD, for depression and her mental health.  (Tr. 354).  Gamble reported that her depression had been worse for several weeks since returning to work.  *Id.*  A review of her systems was positive for fatigue, depression, frequent crying, irritability, inability to concentrate, and sleep pattern changes.  *Id.*  Her physical examination results were normal, and Dr. Kollman assessed Gamble with depression and prescribed medication.  (Tr. 355-356).

On August 17, 2020, Gamble spoke with Nicole Rush, RN, regarding her edema. (Tr. 440).  Gamble reported improvement in her swelling, fatigue, and "DOE" but that she still had some mild symptoms and was unable to track her weight or blood pressure at home.  *Id.* Nurse Rush educated Gamble on the importance of identifying her hypertension and prescribed medication.  (Tr. 440-441).

On August 20, 2020, Gamble saw Hyo Young Smith, MD, to establish care for depression.  (Tr. 436-440).  Gamble reported that she had experienced depression since she was 18; she was prescribed Zoloft, and she had been out of medication for the past two weeks and noticed a difference.  (Tr. 437).  She reported experiencing low motivation, guilt, too much sleep, and poor concentration.  *Id.*  Gamble also reported having hypertension, migraines, congenital heart disease, and obesity.  *Id.*  A review of Gamble's systems and her physical examination results were unremarkable.  (Tr. 437, 439).  Dr. Smith assessed Gamble with moderate episodes of recurrent major depressive disorder, noting she should resume medication and start therapy, as well as a history of congenital heart disease, heart failure, hypertension, obesity, menstrual migraines without status migrainosus, not intractable.  (Tr. 439-440).

4

On September 16, 2020, Gamble saw Trina Davis, Pa-C, regarding possible bariatric surgery.  (Tr. 432).  A review of her systems was unremarkable, as was her physical examination, except for a notation that she was obese.  (Tr. 434).  It was noted that Gamble met the criteria for a surgical weight loss procedure.  *Id.*

On September 21, 2020, Gamble saw Dr. Smith, for her depression.  (Tr. 427).  Gamble reported that she was doing "better;" she was more irritable when she was off the medication, and she thought the dosage was working.  *Id.*  A review of her systems was remarkable for depression, but her physical examination results were unremarkable.  (Tr. 427-428).  Dr. Smith assessed Gamble with moderate episode of recurrent major depressive disorder, and other conditions related to her skin and daytime sleepiness.  (Tr. 428-429).

On October 15, 2020, Gamble saw Serena D. Stevens, PhD, a psychologist, for evaluation before proceeding with a bariatric surgery.  (Tr. 418-419).  Gamble reported that she was on Zoloft for her depression and anxiety and found it helpful.  (Tr. 422).  She denied any current depression symptoms and reported that her anxiety was currently well controlled.  *Id.*  Gamble also reported excessive worrying and a history of panic attacks, although she had not had any recently.  *Id.*  Dr. Smith conducted a mental status exam, and observed that Gamble was fully oriented and cooperative, and had a calm mood; congruent affect; average self-worth; a dissatisfied body image; normal memory, attention, concentration, speech, abstract thinking, and thought content; average psychomotor activity, no evidence of a thought disorder, average intellectual functioning, intact insight, and normal judgment.  (Tr. 423-424).  Dr. Smith's provisional diagnoses was that Gamble had severe obesity, recurrent major depressive disorder, in remission, and anxiety.  (Tr. 424).  Dr. Smith assessed that Gamble's overall psychological state was good and recommended she follow-up in 4-6 weeks.  (Tr. 425).

On October 22, 2020, Gamble had another bariatric surgery consultation.  (Tr. 415).  A review of her systems and physical examination results were unremarkable.  (Tr. 417).  Gamble was to continue with the consultations and tests to qualify for pre-operative clearance for bariatric surgery.  *Id.*

On November 9, 2020, Gamble was seen at Akron General Medical Center for a procedure for H pylori testing.  (Tr. 407-408).

On November 23, 2020, Gamble had another bariatric surgery consultation and received nutritional clearance for surgery.  (Tr. 400-401).  Additionally, Gamble's results from the H pylori testing were reviewed, which indicated she had reactive gastropathy and mild chronic gastritis.  (Tr. 402).

On December 1, 2020, Gamble saw Dr. Stevens for further bariatric consultation. (Tr. 395).  Gamble reported that she was focusing on making changes in line with Dr. Stevens's recommendations, acknowledging that she struggled with increasing her exercise.  (Tr. 396). Dr. Stevens indicated that Gamble's mood was calm; her affect was congruent, and Dr. Stevens noted that Gamble had made progress toward her goals.  *Id.*

On December 21, 2020, Gamble was seen at the Cleveland Clinic regarding her heart. (Tr. 390).  She reported stable exercise tolerance, taking her medication consistently, and no chest pain other than occasional brief sharp pain in the midsternal region.  (Tr. 391).  She noted that her heart occasionally skipped beats, but it was very rare when resting.  *Id.*  Gamble reported having migraine headaches one to two times a month.  *Id.*  Gamble's physical examination was generally unremarkable, except her first heart sound was normal and her second had a physiologically split.  *Id.*  It was noted that she also had mild edema in her ankles and lower

shins with trace amounts in her upper shins.  *Id*.  The impression was the Gamble's examination was consistent with "excellent Melody valve function."  (Tr. 394).

On January 5, 2021, Gamble received cardiac clearance for bariatric surgery.  (Tr. 385).

From March 24, 2021 to June 24, 2021, Gamble saw Deborah L. McFarland, DC, a chiropractor.  (Tr. 492-514).  Throughout the period, Gamble complained of either neck and/or back pain that typically ranged from 3 to 5/10, with her occasionally noting she did not have any complaints.  *Id*.  Dr. McFarland consistently reported finding spinal restrictions at four different discs, pain/tenderness in Gamble's upper to mid-cervical spine and upper thoracic and thoraco-lumbar spine and had normal range of motion in her spine.  *Id*.

On June 28, 2021, Gamble was seen for an echocardiogram, which indicated she had pulmonary atresia with intact ventricular septum, pulmonary valve replaced, and tricuspid regurgitation.  (Tr. 526, 535, 541).  Her physical examination results were unremarkable. (Tr. 523-524).  Her examination was consistent with "excellent Melody valve function." (Tr. 526).

### C.      Relevant Opinion Evidence

#### 1.      Letter - Wellmore Centre

On August 31, 2021, Gamble's therapists provided a letter regarding her psychiatric counseling.  (Tr. 544).  They noted that Gamble initiated care with them on January 26, 2021, but, as of that time, had competed only four counseling appointments, missing seven others.  *Id*. Her last appointment was on May 11, 2021 and she had not returned.  *Id*.

#### 2.      State Disability Psychology Evaluation – Bryan Krabbe, Psy.D.

On December 2, 2020, Gamble saw Bryan Krabbe, Psy.D., for a psychological evaluation.  (Tr. 370).  Gamble reported having emotional breakdowns and depression.  *Id*.

7

Gamble reported problems with hypertension, restrictive lung disease, migraines, and congenital heart disease.  (Tr. 371).  She noted that issues related to her physical ailments made it difficult for her to bend and lift objects, and she also noted being prescribed Zoloft.  *Id.*  Gamble described that she "always feel[s] down," she was "sad most of the time," felt worthless, worried, and had attempted suicide 10 times when she was younger.  (Tr. 372).  She also explained her daily living activities, noting she lived with her husband and children, she homeschooled her children, watched television, played with her children, and that she could perform her daily hygiene activities, household chores, grocery shopping, and meal preparation, but was slow due to physical pain and lack of motivation.  *Id.*  She reported difficulty remembering her appointments and medication.  *Id.*

In a mental status examination, Dr. Krabbe observed that Gamble was cooperative, adequately groomed, and appeared to have adequate energy.  (Tr. 372-373).  Dr. Krabbe noted that Gamble's speech was within normal limits, her thoughts appeared normal, and she appeared sad with a downcast facial expression.  (Tr. 373).  Gamble did not display any autonomic or motoric indications of anxiety.  *Id.*  Dr. Krabbe indicated that Gamble was alert, fully oriented, could recall five digits forward and could recall three digits backwards (noting that the ability to recall four digits backwards is considered average).  *Id.*  In terms of working memory, Gamble had some difficulty calculating division and fractions, and her ability to describe similarities between words was in the average range.  *Id.*  Her intelligence appeared within normal limits. *Id.*  And she appeared to have sufficient judgment and adequate insights into her difficulties.  *Id.*

Dr. Krabbe assessed Gamble with major depressive disorder.  (Tr. 374).  As to her functional abilities, Dr. Krabbe noted that Gamble performed adequately in the activities to measure her ability to understand, carry out, and remember instructions.  (Tr. 374-375).  But

8

Gamble had some difficulty in sustaining concentration and persistence in work-related activities at a reasonable pace.  (Tr. 375).  He assessed Gamble with adequate abilities in maintaining effective social interactions on a consistent and independent basis with supervisors, co-workers, and the public.  *Id.*  As to Gamble's ability to deal with normal pressure in a competitive work setting, Dr. Krabbe noted that she displayed appropriate responses and affect during the examination, but she described depression symptoms that "may compromise her ability to respond to work pressures leading to increased emotional instability and withdraw."  *Id.*

### 3.    State Agency Consultants

### a.    Physical Health Examiners

On September 6, 2022, Steve McKee, MD, evaluated the medical evidence of Gamble's physical RFC.  (Tr. 79-80).  He concluded that Gamble was limited to occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, standing or walking for 2 hours, and sitting for 6 hours in a normal 8-hour day.  (Tr. 79).  He also determined that Gamble was limited to occasionally climbing ramps/stairs; never climbing ladders, ropes, or scaffolds; but was otherwise unlimited in her posture.  (Tr. 79-80).  He did not find that Gamble had any other limitations.  (Tr. 80).  On February 23, 2021, Mehr Siddiqui, MD, reconsidered the medical evidence for Gamble's RFC; he affirmed Dr. McKee's conclusions.  (Tr. 96-97).

### b.    Mental Health Examiners

On December 8, 2020, Carl Tishler, PhD, evaluated the medical evidence of Gamble's mental functioning limitations.  (Tr. 80-81).  Dr. Tishler concluded that Gamble had no limitations in her understanding and memory.  (Tr. 80).  He did, however, find that Gamble was moderately limited in her ability to carry out detailed instructions and in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 80-81). Otherwise, he found that Gamble was not significantly limited or had no limitations. *Id*.

On February 23, 2021, Courtney Zeune, PsyD, reconsidered the medical evidence of Gamble's mental functioning limitations and found that Gamble was also moderately limited in her ability to maintain attention and concentration for extended periods of time; in all other regards she affirmed Dr. Tishler's findings. (Tr. 97-98).

### 4. Function Report – Sarah Gamble

On August 27, 2020, Gamble completed a function report. (Tr. 264-271). Gamble explained that her pulmonary atresia with intact ventricular septum, tricuspid regurgitation, pulmonary valve stenosis and regurgitation, and heart value caused severe leg swelling, to the point where she could not sit or stand for more than 30 minutes. (Tr. 264). She also noted having heart palpitations and her heart skipping beats, and suffering from migraines, depression, and anxiety. *Id.* Her mental health conditions would make her feel that others were against her or speaking against her, which resulted in her getting into disagreements at work and she had struggled to make friends for a long time. *Id.*

Gamble explained that her typical day was waking up, taking her medication, eating breakfast with her children, watching television, playing with her kids, eating lunch, helping her husband with dinner and cleaning, watching television, and then going to sleep. (Tr. 265). She would sometimes also nap. *Id.* She would care for her children, cook, and clean. *Id.* Her husband would also help cook, clean, and feed their animals. *Id.* Her conditions made her tired all the time, causing her to sleep 10 hours a night and nap. *Id.* She did not have any problems

caring for her personal needs.  *Id.*  She would, however, need reminders from her husband to shower and take her medications.  (Tr. 266).

Gamble explained that she could prepare her own meals, making sandwiches, mac and cheese, frozen dinners, and frozen vegetables, and she did so daily.  *Id.*  How long these took her depended on whether her symptoms flared up.  *Id.*  She cooked less than she used to because it was difficult for her to stand, and she would become mentally exhausted.  *Id.*  She would clean the house, which took her all day, and do laundry, which took her multiple days to finish.  *Id.*  But her husband did most of the work.  *Id.*  She did not do yard work because of her heart, and she would be anxious if her neighbors were outside.  *Id.*  Gamble would leave the house with her husband or to go to a doctor's appointment.  (Tr. 267).  She would drive in a car.  *Id.*  She would shop in stores and online for food and clothes; she went grocery shopping about once a week and tried to go when the store was empty.  *Id.*  When in a manic mood, she would overspend, but she otherwise was able to handle money.  *Id.*

Gamble explained that her conditions affected her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, remember things, concentrate, understand things, follow instructions, and get along with others.  (Tr. 268).  She could walk about half a block before needing to rest for about 10 minutes.  *Id.*  She could pay attention for about 3 to 5 minutes.  *Id.*  She could not follow written or spoken instructions well, she avoided authority, and she had been fired/laid off for problems getting along with others.  *Id.*  She indicated she did not have any hobbies but spent time with her children.  (Tr. 269).  She needed reminders to go places and would feel better going places with someone else, although she could sometimes go alone.  *Id.*  She had problems getting along with family and friends, feeling like they disliked her, and she did not know how to

act.  *Id.*  She stayed at home due to her heart conditions.  *Id.*  She also avoided stress and ignored it, she did not handle changes in her routine well, and she avoided authority.  (Tr. 270).

### D.     Relevant Testimonial Evidence

Gamble testified at the administrative hearing.  (Tr. 42-61).  Gamble testified that she stopped working because she noticed that her edema had become increasingly worse, causing her to leave or have to call off work to alleviate the swelling.  (Tr. 43-44).  She eventually stopped working, but before then, she would miss work two or three times a month.  (Tr. 44).  She would also leave early or come in late.  *Id.*  Gamble testified that she worked full-time for KFC from 2006 to 2015, working her way up from crew member to assistant manager.  (Tr. 44-45).  From 2015 to 2020, she worked for a hospitality group, which she left the KFC position for so she could be on her feet less.  (Tr. 47).

Gamble testified that she stopped working and could not return because the swelling in her legs and feet had gotten progressively worse over the preceding three years, and she tried to elevate her feet above her heart twice a day.  (Tr. 51).  The swelling would worsen over the course of a day, and she would become easily fatigued.  (Tr. 52-53).  She tried to elevate her legs for an hour or two at a time.  (Tr. 53).  Compression stocking had not helped, but she also took medication for the swelling.  (Tr. 53-54).  Gamble testified that she could lift about 10 pounds, walk for about a minute to a minute and a half before needing to rest, and usually shopped while holding onto the cart because she would get out of breath easily.  (Tr. 54).  She thought she could walk about 5 minutes without stopping; but after a minute and a half she noted her heart rate increasing.  (Tr. 55).  She would try to walk a half hour with her kids, but she would not make it, needing to periodically rest for about a minute.  *Id.*  She could stand for about 15 to 20 minutes before her legs would tingle, and she would sit for about an hour.  (Tr. 55-56).  Gamble testified

that she took Zoloft for her depression and anxiety, which helped her symptoms to some extent. *Id.*  She had started counseling, but she found it of limited help because going to the counseling center would increase her anxiety.  (Tr. 57).

Gamble testified that her typical day was getting up at 7 am, making breakfast, waking up her kids, elevating her feet, then making lunch, taking a nap, and then cleaning up a bit.  *Id.* Once her husband was home, she would lay down and elevate her feet again, and then she was in bed by 9 pm.  *Id.*  She could cook, bathe, and dress herself, but her husband helped her wash her hair.  (Tr. 58).  She would take her kids to the park and her hobbies included spending time with her family.  *Id.*  She did the grocery shopping and cleaning with her husband.  (Tr. 59).  Gamble also testified that she experienced heart palpitations about two to three times a month that lasted a few seconds.  *Id.*  She also experienced dizziness a couple of times a year, and chest pain about once or twice a month.  (Tr. 60).  Gamble testified that she also experienced shortness of breath when walking up or down stairs or walking for a few minutes and experienced fatigue every day, napping during the day.  *Id.*  Her depression would cause her to lack motivation, a couple of times a week, which would also result in her not showering.  (Tr. 61).

## III.    Law & Analysis

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion.  *O'Brien v.*

*Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will

not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced

the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court

uphold a decision when the Commissioner's reasoning does "not build an accurate and logical

bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D.

Ohio 2011) (internal quotation marks omitted).

> **B.**     **Step Four: Subjective Symptom Complaints**

Gamble argues that the ALJ erred in evaluating her subjective symptoms complaints,

failing to explain how the evidence did not support Gamble's subjective complaints.[3]  *See* ECF

Doc. 8 at 10-16.  The Commissioner disagrees.  ECF Doc. 9 at 12-15.

A claimant's subjective symptom complaints are among the evidence that an ALJ must

consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e);

*Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or

other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether

she finds the claimant's subjective complaints consistent with objective medical evidence and

other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v.*

*Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for

---

[3] Gamble makes a passing assertion that the ALJ erred by failing to include limitations based on
Gamble's pain, stating: "In this matter, the RFC erroneously failed to include the effects of Gamble's pain
would interfere with her ability to maintain attention and concentration, necessitating a reversal or remand
of this matter."  ECF Doc. 8 at 14.  From this phrasing, it is unclear whether Gamble is raising an
independent argument regarding additional limitations the ALJ should have included in her RFC or
simply referencing her separate argument regarding limitations for attention and concentration.  Because
the heading and vast majority of Gamble's argument in the section of her brief refers to the ALJ's
consideration of her subjective symptom complaints, and Gamble referenced the lack of limitations in
connection with her ability to maintain attention and concentration, I consider the passing statement to be
a reference to Gamble's separate argument, addressed later in this report and recommendation, and any
independent argument on that basis is forfeited for lack of full development.  *McPherson v. Kelsey*, 125
F.3d 989, 995-96 (6th Cir. 1997).

discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding that Gamble's subjective symptoms complaints were inconsistent with the medical and other evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Blakley*, 581 F.3d at 405. Gamble devoted nearly all of her argument to the conclusory assertion that the ALJ's conclusion was erroneous because of the record evidence.  *See* ECF Doc. 8 at 10-15.  She did, however, make one passing reference to the ALJ's conclusion that Gamble's subjective pain complaints were inconsistent with the record and argued that the ALJ failed to explain her reasons for rejecting Gamble's complaints.  ECF Doc. 8 at 15.  These arguments miss the mark.

Starting with the latter, the ALJ provided a detailed explanation for rejecting Gamble's pain complaints, citing her largely unremarkable test results and physical examinations, her improvement post-heart surgeries, and the variety of daily living activities she was able to perform.  (Tr. 27).  This was sufficient to satisfy the ALJ's analytical obligations under the regulations and to build a logical bridge between the evidence and her conclusions.  SSR 16-3p, 2016 SSR LEXIS 4 *15; *Felisky*, 35 F.3d at 1036.

Moreover, regardless of the record evidence Gamble can cite to support her claims, the ALJ's conclusions were also supported by substantial evidence and, thus, remand is not warranted.  *Blakley*, 581 F.3d at 406; *O'Brien*, 819 F. App'x at 416.  Such evidence includes: (1) Gamble's unremarkable test results, (*see* Tr. 310-311, 402, 526); (2) Gamble's unremarkable physical examination results, (*see* Tr. 309, 355-356, 372-373, 391, 417, 423-424, 428, 434, 439); (3) treatment notes noting her improvement post-heart surgeries, (*see* Tr. 307-308); and (4) Gamble's various activities of daily living, including playing with her children, cooking, and meeting her personal needs (*see* Tr. 57-59, 265-267, 372).  Accordingly, the ALJ's decision fell within her "zone of choice," and remand on this issue is not warranted.  *Mullen v. Bowen*, 800 F.3d 535, 545 (6th Cir. 1986) (recognizing that there is a "zone of choice" within which decisionmakers may reasonably reach contrary decision and, those decision cannot be second-guessed by the court).

## C.    Step Four: Residual Functional Capacity

Gamble contends that the ALJ erred in making her Step Four RFC findings in three ways, by failing to: (i) consider how Gamble's obesity interacted with her other physical impairments, (ii)  include limitations based on her impaired attention and concentration, and (iii) include limitations related to her need to elevate her legs.  ECF Doc. 8 at 7-10, 13-14.  She argues that

the ALJ's errors rendered her hypothetical question and conclusions as to Gamble's ability to perform her past relevant work erroneous.[4] ECF Doc. 8 at 17-19. The Commissioner disagrees, arguing that Gamble had only mild or trace edema and no medical evidence indicated she needed to elevate her legs. ECF Doc. 9 at 6-11, 15-16.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5. The ALJ's hypothetical to the vocational expert is only required to incorporate those limitations the ALJ finds credible. *See Bolton v. Comm'r of Soc. Sec.*, 730 F. App'x 334, 338 (6th Cir. Apr. 12, 2018) (citing *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Although obesity is not a listed impairment, the functional limitations it causes, alone or in combination with other impairments, may medically equal a listing, such as by increasing the severity of a coexisting or related impairment. *See* SSR 19-2p, 2019 SSR LEXIS 2, at *11. And, accordingly, it must also be considered in the ALJ's determination of a claimant's RFC.

---

[4] Gamble presents this argument as an independent contention; however, because Gamble bases her challenge to the ALJ's finding on her past relevant work on her prior contentions regarding her need to elevate her legs and ability to maintain attention and concentration, I will treat it as a sub-argument. ECF Doc. 8 at 16-19.

*See Miller v. Comm'r*, 811 F.3d 825, 835 (6th Cir. 2016) (noting SSR 19-2p's predecessor "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all states of the sequential evaluation") (citations omitted)).  Further, "[a]s with any other impairment, we will explain how we reached our conclusion on whether obesity causes any limitations."  SSR 19-2p, 2019 SSR LEXIS 2, at *12-13.

In *Sorrell v. Comm'r of Soc. Sec.*, the Sixth Circuit held that an ALJ was not required to include a limitation that a claimant was required to elevate her legs in his RFC finding.  656 F. App'x 162, 170 (6th Cir. 2016).  The Sixth Circuit explained that "[i]t [was] clear from the record that the ALJ considered [the claimant's leg] swelling and the need for her to elevate her legs." *Id.*  Further, although "some treatment records mentioned leg elevation as a treatment for edema, no physician indicated that [the claimant's] edema caused work-related functional limitations, and no medical expert opined that [the claimant] would need to elevate her feet to waist level during the workday or even every day." *Id.*  Moreover, the claimant's own testimony indicated that the swelling was intermittent and that it reduced with medication. *Id.*

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in determining Gamble's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e); *Blakley*, 581 F.3d at 405.  First, as to Gamble's obesity, the ALJ expressly considered the condition in reaching her RFC determination, citing evidence which confirmed that Gamble was obese during the period under adjudication.  (Tr. 26)  But the ALJ found that Gamble's obesity "[having been considered] at each step of the sequential evaluation, . . . [Gamble] is capable of performing a range of sedentary work." *Id.*  Gamble summarily contended that "[t]he combination of Plaintiff's obesity and other physical problems imposed greater functional limitation than if each of the impairments was considered separately."  ECF Doc. 8 at 14.

However, Gamble never explained what greater functional limitations she believes the ALJ should have found.  *See* ECF Doc. 8 at 14-16.  Thus, even if the ALJ's analysis were insufficient, Gamble has failed to meet her burden of "showing specifically how [her] obesity, in combination with other impairments, limited [her] ability to a degree inconsistent with the ALJ's RFC determination."  *Wagner v. Comm'r*, No. 1:15-CV-0558, 2016 WL 2585797 at *6 (W.D. Mich. May 5, 2015) (analyzing SSR 19-2p's predecessor); *see also Lawrence v. Comm'r of Soc. Sec.*, No. 1:21-CV-01691, 2023 U.S. Dist. LEXIS 32994, at *51-52 (N.D. Ohio Jan. 19, 2023) (noting precedent where the general description of the impact of obesity was found not to be erroneous because of the lack of medical evidence supporting limitations from the condition or its combination with other impairments).

Likewise, the ALJ followed the proper legal standards in deciding not to include a limitation related to Gamble's alleged need to elevate her legs.  *Blakley*, 581 F.3d at 405.  The ALJ complied with the regulations by considering all of Gamble's impairments in light of the medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e); SSR 96-8p, 1996 SSR LEXIS 5.  In doing so, the ALJ expressly discussed Gamble's heart and leg issues – including her testimony that she elevated her feet twice a day to avoid excessive swelling.  (Tr. 25).

Substantial evidence supports the ALJ's decision to not include a limitation reflecting Gamble's leg elevation in her RFC.  *Blakley*, 581 F.3d at 406.  The medical evidence did not include any notes from a medical care provider instructing Gamble to elevate her legs.  Although medical records indicated Gamble had edema in her legs, such was consistently noted to be only mild to moderate in nature and none of those notes included instructions for Gamble to elevate her legs.  (*See* Tr. 308, 311, 391, 440).  Thus, in the absence of any evidence that a physician or other medical professional indicated that Gamble would need to elevate her legs, the ALJ was

neither required to include a leg-elevating limitation in the RFC nor required to give any extensive discussion in her decision.  *See Sorrell*, 656 F. App'x at 170.  This is true even though Gamble has – apparently on her own initiative – used leg elevation to help with her symptoms.

Lastly, as to Gamble's ability to maintain attention and concentration, the ALJ applied the proper legal standards and reached a decision supported by substantial evidence in finding minimal limitations related to Gamble's ability to pay attention and concentrate.  *Blakley*, 581 F.3d at 405-406.  Gamble contends that the ALJ failed to include *any* limitations based on her ability to maintain attention and concentration.  *See* ECF Doc. 8 at 9.  However, that argument is belied by the administrative record.  As identified by the state agency consultants, whose opinions the ALJ found persuasive, Gamble's attention and concentration were found to be impaired and resulted in their recommendations that she be limited to "performing multi-step tasks in a setting with flexible pace and production requirements."  (*See* Tr. 81, 97).  The ALJ adopted these limitations into her RFC findings.  (Tr. 24).  Thus, the ALJ plainly considered Gamble's limitations in her ability to pay attention and concentrate.  Moreover, the ALJ noted Gamble's complaints to Dr. Krabbe that she had concentration problems, the state agency consultants' opinions that she was limited to the performance of multi-step tasks in a setting with flexible pace and production requirements, and Dr. Krabbe's assessment that Gamble had limitations in maintaining attention and concentration.  (Tr. 27-28).  As such, the ALJ reasonably adopted the limitations supported by the state agency consultants (from which Gamble almost exclusively bases her argument), and included those limitations in her RFC findings.

Substantial evidence supports the ALJ's limitation regarding Gamble's ability to maintain attention and concentration.  *Blakley*, 581 F.3d at 406.  Such evidence includes: (i) the limitations consistency with the opinions of the state agency consultants and Dr. Krabbe, (*see*

Tr. 81, 106, 375); and (ii) minimal notes on any limitations in Gamble's concentration, (*see*

Tr. 354, 423-424, 437).  Accordingly, the ALJ's limitation was supported by substantial

evidence, and remand is not warranted.

## IV.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by

substantial evidence, I recommend that the Commissioner's final decision denying Gamble's

applications for DIB and SSI be affirmed.


Dated: July 25, 2023

Thomas M. Parker

United States Magistrate Judge


## Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may
serve and file specific written objections to the proposed findings and recommendations of the
magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.
§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the
assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the
right to raise the issue on appeal either to the district judge or in a subsequent appeal to the
United States Court of Appeals, depending on how or whether the party responds to the report
and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be
specific and not merely indicate a general objection to the entirety of the report and
recommendation; "a general objection has the same effect as would a failure to object." *Howard
v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus
on specific concerns and not merely restate the arguments in briefs submitted to the magistrate
judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge
without specific objections 'wastes judicial resources rather than saving them, and runs contrary
to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist.
LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific
objections may in rare cases be excused in the interest of justice.  *See United States v.
Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).